**MILBERG COLEMAN BRYSON PHILIPS GROSSMAN PLLC**
John J. Nelson
280 S. Beverly Dr.
Beverly Hills, CA 92102
(858) 209-6941
Jnelson@milberg.com

**FREED KANNER LONDON AND MILLEN LLC**
Jonathan M. Jagher (*pro hac vice*)
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6486
Jjagher@fklmlaw.com

*Counsel for Plaintiffs and the Putative Classes*

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

NEIL GETZ and JUSTIN BREWER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CVS HEALTH CORPORATION, CVS PHARMACY, INC., CRITEO CORP., and MEDALLIA, INC.

Defendants.

Case No. 2:25-cv-04689-MWC-E

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Cal. Penal Code § 631(a)**
2. **Cal. Penal Code § 632(a)**
3. **Cal. Bus. & Prof. Code §§ 17200 *et seq.***
4. **Breach of Confidence**
5. **Invasion of Privacy Under Cal. Const.**
6. **Common Law Invasion of Privacy—Intrusion Upon Seclusion**
7. **Negligence and Negligence *Per Se***

Plaintiff Neil Getz and Justin Brewer (collectively, "Plaintiffs") bring this class action complaint on behalf of themselves and all others similarly situated ("Class Members") against CVS Health Corporation ("CVS Health") and CVS Pharmacy, Inc. ("CVS Pharmacy" collectively with CVS Health, "CVS"), Criteo Corp. ("Criteo"), and Medallia, Inc. ("Medallia," collectively with CVS and Criteo, "Defendants"). The

allegations contained in this class action complaint are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## NATURE OF THE ACTION

1. CVS, which has over 36 million customers, maintains an online pharmacy, retail store for over-the-counter medical products, vaccination center, and health clinic, all through its website, www.cvs.com ("Website"). CVS encourages Website users, including Plaintiffs and Class Members, to use the Website to search for and purchase over-the-counter medications and healthcare products, schedule vaccine administrations, manage prescriptions, schedule in-person and virtual doctor appointments via the MinuteClinic Services, and take other actions related to their personal healthcare. While doing this, Website users, including Plaintiffs and Class Members, conveyed Private Information, including medical information, to CVS.

2. CVS' Pharmacy and Consumer Wellness segment, as of December 31, 2024, filled 1.7 billion prescriptions and dispensed approximately 27% of total retail pharmacy prescriptions in the United States. CVS acknowledges the importance of the Website, stating that "[c]onsumers also are increasingly seeking to access consumer goods and health care products and services locally and through other direct channels such as mobile devices and websites."[1]

3. Plaintiffs and all other Class Members are users who communicated with CVS through the Website. They shared information, including their Protected Health Information ("PHI") and Personally Identifiable Information ("PII") (together, "Private Information"), with the reasonable belief that CVS would take appropriate steps to maintain the privacy of these communications.

[1] CVS Form 10-K for Fiscal Year Ended December 31, 2024; https://www.sec.gov/ix?doc=/Archives/edgar/data/64803/000006480325000007/cvs-20241231.htm (last accessed July 9, 2025).

4. Instead, CVS did the opposite, aiding, employing, agreeing, and conspiring with Adobe, Inc. ("Adobe"), Criteo, Medallia, (collectively, "Third-Party Trackers") and others to intercept sensitive and confidential personal and medical communications of Website users via third-party code embedded on the Website.

5. Criteo is a digital advertising company that focuses on serving personalized advertisements. In 2024, Criteo and Criteo SA reported approximately $1.9 billion in revenue. Criteo describes itself as partnering with some of the largest and most sophisticated consumer brands, retailers, commerce companies and media owners in the world "to capture user activity on their websites and mobile applications […], which we define as digital properties, and leverage that data to deliver superior ad performance to help marketers, brands and agencies reach their campaign objectives from top to bottom of the marketing funnel."

6. Medallia is a multi-faceted digital advertising and data analysis company that focuses on collecting, compiling, and processing its clients' customer and employee data. Medallia's clients, which are some of the largest corporations, including 3M, H&R Block, Nissan, Lego, and Johnson & Johnson, use its software to "understand customer behaviors and intentions, and use that information to curate intuitive, personalized experiences in real time."[2] Medallia describes its digital solutions as permitting customers to "identify who is visiting your digital property and what they want while powering individualized next/best actions across your organization." For example, it touts that its Total Experience Profile can "bring together data from every experience to create a complete timeline of every interaction a customer has with your company—whether online, by phone, via chat, or in person," empowering companies to "provide personalized service, orchestrate better omni-channel programs, and create more relevant campaigns powered by experience-based segmentation."[3]

---

[2] https://www.medallia.com/suite/digital-experience/
[3] https://www.medallia.com/platform/

7. Through the third-party code it implemented on the Website, CVS has, unbeknownst to Plaintiffs, disclosed information about Plaintiffs' and Class Members' medical conditions, immunizations and vaccines, prescriptions, and other Private Information, including their activity searching for and purchasing sensitive healthcare products. With CVS' help, Third-Party Trackers have likewise intercepted these confidential communications without Plaintiffs' or Class Members' knowledge or consent.

8. As described in detail herein, CVS disclosed Plaintiffs' and Class Members' Private Information, *inter alia*: (1) directly to Adobe, which in turn disclosed it to other third-party advertising companies including Criteo; (2) directly to Criteo; and (3) directly to Medallia.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from the Defendants.

10. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiffs are residents of California whereas CVS defendants, Criteo, and Medallia are Delaware entities with their principal places of business in Rhode Island, New York, and California, respectively.

11. The Court has personal jurisdiction over Defendants because they regularly conduct business in California, Plaintiffs reside in California, and a substantial part of the events giving rise to Plaintiffs' claims occurred in California. CVS is also headquartered in California. Additionally, because third-party Adobe is headquartered in California, evidence related to Adobe's tracking methods and receipt and use of Private Information

is located in California.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Plaintiff Getz resides in this District, CVS is headquartered in this District, and Defendants are each subject to personal jurisdiction in this District.

## THE PARTIES

13. Plaintiff Neil Getz is an adult citizen of the state of California and resides in Ventura, California.

14. Plaintiff Justin Brewer is an adult citizen of the state of California and resides in San Jacinto, California.

15. Defendant CVS Health Corporation is a Delaware corporation with its principal executive offices and principal place of business located in Rhode Island.

16. Defendant CVS Pharmacy, Inc. is a subsidiary of CVS Healthcare that, upon information and belief, operates the Website. CVS Pharmacy is a Rhode Island corporation with its principal executive offices and principal place of business located in Woonsocket, Rhode Island.

17. Defendant Criteo Corp. is a Delaware corporation with its principal executive offices and principal place of business located in New York, New York. Criteo Corp. is a wholly owned subsidiary of Criteo S.A. ("Criteo SA"), a French corporation.

18. Defendant Medallia, Inc. is a Delaware corporation with its corporate headquarters and principal place of business located in Pleasanton, California.

## FACTUAL ALLEGATIONS

### A. Statutory Background

19. The California Invasion of Privacy Act ("CIPA") prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or

communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

20. To establish liability under CIPA, a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

21. Violations of CIPA are not limited to phone lines, but also apply to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, No. 15-cv-04062, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, No. C06-05289 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history). Indeed, similar tracking technologies were examined by the Northern District of California with the district court concluding that the plaintiffs were likely to succeed on the merits with respect to both CIPA and the analogous Federal Wiretap Act. *See In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at

*11, 13 (N.D. Cal. Dec. 22, 2022).

22. CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless of whether they suffered actual damages. Cal. Penal Code § 637.2.

**B. Without Users' Knowledge or Consent, CVS Discloses and Aids in Adobe's Interception of Website Users' Private Information.**

23. Unbeknownst to Plaintiffs and Class Members, CVS installed code onto the Website that includes a software develop kit ("SDK") offered by Adobe ("Adobe Trackers") associated with the "Adobe Experience Cloud," which allows Adobe to intercept Website users' activity and PHI. The Adobe Trackers intercept and collect a host of Private Information Website users submit, including, *inter alia*:

(a) exact text entered into the search bar on the Website,

(b) over-the-counter drug and prescription drug products that Website users, including patients, searched for, viewed, placed in their shopping cart, or purchased,

(c) appointments patients scheduled to receive vaccinations, including the names of the vaccine(s) and the location and date and time they were to be administered, and

(d) information concerning MinuteClinic appointments, including the symptoms patients were experiencing or the medical procedure they requested and the store zip code.

24. The Adobe Experience Cloud consists of Adobe's integrated online marketing and web analytics products. Although discovery is necessary to confirm the full extent of Adobe Experience Cloud products incorporated onto the Website, the products compromising the various Adobe Trackers installed on the Website are numerous and include, at a minimum: Adobe Analytics, Adobe Launcher, Adobe Advertising Cloud ("everesttech.net"), Adobe Target, Adobe Audience Manger, and the Adobe Experience

Cloud Identity Service.

25. Adobe's tracking technology, such as Adobe Analytics and Adobe Experience Cloud, collects and processes Website users' data to facilitate CVS' marketing and advertising efforts. When a user visits the Website, the system assigns a unique identifier to the user and collects behavioral data from them, including page views, interactions, and device-related information. This data is transmitted to Adobe's servers, where it is analyzed and used to build or update user profiles for each of those users. Adobe provides access to these profiles and users' private actions to CVS through its marketing and personalization services.

26. The data CVS transmits to Adobe may also be leveraged for audience targeting, segmentation, and integration with third-party advertising networks. The dangers to personal privacy include the fact that sensitive PHI, including medications and health conditions, are linked to the profiles, exposing Website users to targeted advertising based on their private health choices.

27. CVS' exposure of its customers' data to Adobe's ecosystem without consent violates users' privacy and constitutes misuse by third-party advertisers, and also establishes Adobe's capabilities of transmitting this data to third parties other than CVS for its own commercial benefits, including Meta/Facebook and additional third-party services including Criteo, adsrvr.org/The Trade Desk, and Quantum Metric, Inc. As described below, CVS additionally transmits Website users' communications directly to Criteo.

28. Specifically, the Adobe Trackers enable Adobe's data collection and sharing via server connections. They operate as tracking scripts and software that intercept and collect a user's internet activity data through multiple user identifiers and cookies. The Adobe Trackers send this information to Adobe-controlled server and/or domains, which host and process data the Adobe Experience Cloud products.

29. The unique user identifiers and cookies Adobe Trackers utilize on the

Website include, *inter alia*, those in the following formats: d_mid, demdex, dpm, d_uuid, kndctr_<Org_Id>_AdobeOrg_identity & Id Value, Experience Cloud ID ("d_mid" or "ECID," also known as "MID") (collectively, the "Adobe Identifiers"). Adobe assigns unique values for each of these identifiers for each user, which it uses to track users' activities across devices and accounts. For example, the demdex identifier is a persistent, unique identifier assigned to each visitor on a website or app using Adobe's analytics tools. The demdex ID is stored on a user's browser as a cookie and can be used for tracking and targeting purposes, allowing Adobe to recognize the user on subsequent visits, even if they come from different devices or channels.[4] To help Adobe identify and recognize people across different websites, it uses ID sync parmeter called "d_uuid", which functions as a mapping tag to match Adobe's identifier to third -party IDs. Specifically, the d_uuid appears in web addresses Adobe sends to third-party EverestTech, as described below, to match Adobe's user ID with EverestTech's own ID for the same person. In this way, the d_uuid code helps Adobe Audience Manager and third-parties track Plaintiffs' and Class Members' activity on the Website. In addition, Adobe uses an alphanumeric string to uniquely identify each of its customers across Adobe's products.

30. According to Adobe, "The Experience Cloud ID (MID) [or ECID] is derived mathematically from your organization ID and the demdex ID. As long as these IDs remain constant, generating the right MID for a specific user is simply a math problem. With the same organization ID and demdex ID you get the same MID value, but this depends on the user maintaining the same browser cookies and identifiers. This allows the ID service to track visitors across domains that you control and have configured with

---

[4] *See* Adobe, Audience Manager Cookies; https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager (last accessed July 9, 2025); *see also* Adobe, Cookies and the Experience Cloud Identity Service; https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies (last accessed July 9, 2025).

ID service code."[5] The Adobe Experience Cloud uses the s_ecid cookie to store a user's ECID and/or MID, and the s_ecid cookie contains a copy of the user's ECID and MID.[6]

31. The ECID, or MID, is a unique user identifier assigned to a specific user that consists of an alphanumeric string, which can be set with Adobe's Experience Cloud Identity Service. It is "a shared identity namespace used across Adobe Experience Platform and Experience Cloud applications to track visitor behavior and ensure that each device has a unique identifier that can persist across multiple sessions."[7] Using the ECID, the Experience Cloud Identity Service:

- "Uniquely identifies a visitor on a device across multiple applications.
- Sets a first-party cookie in customer's domain to ensure tracking on same domain. […]
- Receives aliases and ID mappings from Experience Cloud customers and partners.
- Manages ID synchronization within the Experience Cloud.
- Supports ID synchronization with different third-parties cross the ad tech ecosystem."[8]

32. Adobe uses the ECID to track users across multiple devices and touchpoints, which cross-channel tracking allows it to correlate all actions a user takes, providing a single unified view of the customer's online activity. Adobe visualizes this with the following identity graph:[9]

---

[5] https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies#section-15f69c0bac394b4b9966a23fbc586d17

[6] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/experience-cloud

[7] Adobe, Experience Cloud Identity Service Overview; https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview (accessed July 9, 2025).

[8] *Id.*

[9] Adobe, Adobe Experience Platform Identity Service; https://experienceleague.adobe.com/en/docs/experience-platform/identity/home (accessed July 9, 2025).




33. Even if users clear cookies, Adobe collects device fingerprinting data (such as tracking browser type, screen resolution, and IP address, etc.), which can help its tracking methods recognize returning users.

34. Meanwhile, Adobe's Demdex server also synchronizes users' unique identifiers with third-party advertising partners like Criteo, EverestTech, and Adsrvr/The Trade Desk, ensuring that even non-logged-in users see targeted ads based on their browsing behavior.

35. The Demdex IDs are tied to users' activity across different websites that use the Adobe Experience Cloud suite of products, permitting Adobe to track Website users' activity on unrelated websites. In this way, as part of the services Adobe offers to its clients, it incorporates personal data it obtains from users' activity on the Website and across these other, unrelated websites, to serve its customers using a comprehensive profile of the Website user, including the user's Private Information, to enrich its customers' marketing analytics.

36. For example, when a user visits the Website, the Adobe Trackers download a script onto the user's browser. When executed, these scripts disclose Website users' unique Demdex IDs to Adobe-owned servers, including those operated by Adobe's data

management platform (DMP). After receiving the users' Demdex ID, Adobe facilitates the setting of an Everest Technologies cookie on the user's browser through a tracking mechanism.

37. Adobe uses Everest Technologies to perform real-time advertising bidding and audience segmentation to enhance advertising display campaigns for its Adobe Experience Cloud customers. Website users' unique Demdex IDs are transmitted to Everest Technologies via Adobe's data-sharing infrastructure when Website users visit the Website. Adobe leverages the personal data that Everest Technologies collects from Website users' activity to provide advertising services for its Adobe Experience Cloud customers. By doing so, Adobe discloses identifiable browsing behavior and associated data points it obtains from Website users' activity to third parties.

38. That Everest Technologies, which operates within Adobe's programmatic advertising ecosystem, obtains Website users' unique Demdex IDs when they visit the Website confirms Adobe's capability to use Website users' behavioral data for its own purposes, including enhancing targeted advertising strategies for its third-party customers.

39. Indeed, the Adobe Experience Cloud Terms of Use suggest Adobe uses intercepted data for its own operating and marketing services and to improve its services to customers. The terms state: "You grant Adobe a worldwide, royalty-free, non-exclusive, transferable, and sublicensable license to adapt, display, distribute, modify, perform, publish, reproduce, translate, and use Your Materials for the purpose of operating, marketing and improving the Services and enabling your use of the Services."[10] Adobe defines Materials to include the intercepted information at issue here: "Materials' means any materials provided by You, Adobe, or a third party, including without

---

[10] Adobe, Adobe Experience Cloud Terms of Use https://www.adobe.com/content/dam/cc/en/legal/servicetou/Experience_Cloud_TOU_en_WW_20220608.pdf (last accessed July 9, 2025).

limitation any (a) user material, including usage and telemetry activities; (b) reports, text, code, data, documents, images, photographs, graphics, audio, videos, or webcasts; (c) products; or (d) Software."[11]

40. The Adobe Trackers CVS installed on the Website intercept, collect, use, and disclose to third parties Website users' Private Information, and they do so without the Website users' knowledge or consent. Specifically, the Adobe Trackers implemented on the Website intercepted users' activity in at least the following instances: 1) keyword searches, including for over the counter medication and other health products, including sexual health products; 2) viewing, clicking on, and purchasing these healthcare products; 3) selecting vaccines and scheduling appointments for their administration; 4) scheduling MinuteClinic appointments, including the symptoms patients were experiencing or the medical procedure they requested and the store's zip code; and 5) managing prescription drugs.

***i. Keyword Searches***

41. The Website's homepage encourages users to "search products and services" via its prominently displayed search bar at the top of the page.[12] Patients may run any searches on the Website, regardless of which products CVS stocks. For example, as depicted in Figure 1, below, Website users may search for "aspirin." Indeed, Website users may type an endless variety of search terms based on their healthcare needs to find sensitive healthcare products that CVS stocks, such as "birth control"[13], "pregnancy

---

[11] *Id.*
[12] CVS; https://www.cvs.com/ (last accessed July 9, 2025)
[13] CVS; https://www.cvs.com/search?searchTerm=birth%20control (last accessed July 9, 2025)

tests”[14], “fertility tests”[15], “baby gender DNA tests”[16], and “paternity tests.”[17]




Figure 1

42. As shown in the redacted website traffic between the Website and Adobe's Adobedc.net server in Figure 2, below, which corresponds with the web image displayed in Figure 1, the Adobe Trackers, as implemented by CVS, intercept Website users' Private Information, including any search terms Website users' search via the search bar, unbeknownst to them. Highlighted in yellow, the Adobe Trackers transmitted to Adobe the exact URL of the search results, which expressly includes the search terms: here, “aspirin.” Highlighted in blue, the Adobe Tracker also transmits to Adobe each of the search results for the search query, including the product names, the skuID numbers, and the parentSku numbers. Regardless of the search or search results, the Adobe Tracker is

[14] CVS; https://www.cvs.com/search?searchTerm=pregnancy%20test (last accessed July 9, 2025)

[15] CVS; https://www.cvs.com/search?searchTerm=fertility%20test (last accessed July 9, 2025)

[16] CVS; https://www.cvs.com/search?searchTerm=baby%20gender%20test (last accessed July 9, 2025)

[17] CVS; https://www.cvs.com/search?searchTerm=paternity%20tests (last accessed July 9, 2025)

programmed to systematically intercept the search results URL, which include the searches run by Website users, and any products responsive to that search request. Additionally, highlighted in purple, the Adobe Tracker also assigns and tracks unique identifiers assigned to Website users and their activity.

43. The web image and code depicted in Figure 1 and Figure 2 reflect the activities of Website users who are proceeding as guests. However, the Adobe Trackers intercept the same substantive information reflected in these figures when a Website user is logged in, except that, when logged in, Adobe also intercepts additional persistent user identifiers, such as a PPID, which CVS transmits to allow Adobe to recognize logged in users and associate the user's behavior across visits.

POST https://edge.adobedc.net/ee/or2/v1/interact?configId=1e24809d-8a88-43c9-ba9a-0babf0fb08c7&[redacted] HTTP/2
content-length: 4154 cache-control: max-age=0 sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 [redacted] sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132" content-type: text/plain; charset=UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty 15ealium15: https://www.cvs.com/search?searchTerm=aspirin accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: edge.adobedc.net
{"meta":{"configOverrides":{},"sdkConfig":{"datastream":{"original":"2612b8ac-d4b2-4d6d-8d99-878e3f9e5846"}},"state":{"domain":"cvs.com","cookiesEnabled":true,"entries":[{"key":"kndctr_06660D1556E030D17F000101_AdobeOrg_cluster","value":"or2"},{"key":"kndctr_06660D1556E030D17F000101_AdobeOrg_Identity","value":"[redacted]I="}]}},"events":[{"query":{"personalization":{"schemas":["https://ns.adobe.com/personalization/default-content-item","https://ns.adobe.com/personalization/html-content-item","https://ns.adobe.com/personalization/json-content-item","https://ns.adobe.com/personalization/redirect-item","https://ns.adobe.com/personalization/ruleset-item","https://ns.adobe.com/personalization/message/in-app","https://ns.adobe.com/personalization/message/feed-item","https://ns.adobe.com/personalization/dom-action"],"decisionScopes":["__view__"],"surfaces":["web://www.cvs.com/search"]}},"xdm":{"web":{"webPageDetails":{"URL":"https://www.cvs.com/search?searchTerm=aspirin"},"webReferrer":{"URL":"https://www.cvs.com/"},"type":"other","webInteraction":{"URL":"https://www.cvs.com/search?searchTerm=aspirin","linkClicks":{"value":1},"name":"15ealiu_tracking"}},"device":{"screenHeight":982,"screenWidth":1512,"screenOrientation":"landscape"},"environment":{"type":"browser","browserDetails":{"viewportWidth":1512,"viewportHeight":857}},"placeContext":{"localTimezoneOffset":-60,"localTime":"2025-01-

31T08:59:07.324+01:00”},”timestamp”:”[redacted]”,”implementationDetails”:{“name”:”https://ns.adobe.com/experience/alloy","version":"2.19.2","environment”:”browser”},”eventType”:”web.cmxImpressionTracking.linkClic”s”,"_cvs":{”Criteo”:{“criteoCustomerID”:””,”criteoVisitorID”:”1738310345737”,”criteoProductDetails”:[{“clientAdvertiserId”:”7915838","productName”:”Bayer Aspirin 81mg Low Dose Enteric Coated Tablets”,”skuID”:”126928”,”parentSku”:”1012177”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”BAYER RAPID RELIEF RASPBERRY POWDER PACKS”,”skuID”:”181185”,”parentSku”:”7200047”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”Bayer Back&Body Aspirin500mg+Caff32.5mg X-Str Coated Caplets”,”skuID”:”207980”,”parentSku”:”1012207”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7868529”,”productName”:”EXCEDRIN TENSION HEADACHE CAPLETS”,”skuID”:”265984”,”parentSku”:”265984”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”BAYER LOW DOSE ASPIRIN CHERRY 81MG CHEWABLE TABLETS 3PK”,”skuID”:”298486”,”parentSku”:”298486",”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838","productName":"Bayer Aspirin 81mg Low Dose Chewable Tablets Orange Flavored”,”skuID”:”522987”,”parentSku”:"522987”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”BAYER ASPIRIN SAFETY COATED 325MG CAPLETS 100CT”,”skuID”:”669317”,”parentSku”:”1012106”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”Bayer Aspirin 81mg Low Dose Enteric Coated Tablets”,”skuID”:”695200”,”parentSku”:”1012066”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”Bayer Aspirin 325mg Coated Tablets”,”skuID”:”695201”,”parentSku”:”1012212”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7868529”,”productName”:”Excedrin Migraine Acet250mg+Asprn250mg+Caff65mg X-Str Caplet”,”skuID”:”906001”,”parentSku”:”1012028”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7868529”,”productName”:”Excedrin Extra Strength Acet250mg+Asprn250mg+Caff65mg Caplet”,”skuID”:”917967”,”parentSku”:”1012217”,”productPosition”:”16ealiu”,”criteoOnLoad”:”1”},{“clientAdvertiserId”:”7915838”,”productName”:”Bayer Aspirin 81mg Low Dose Chewable Tablets Orange Flavored”,”skuID”:”947994”,”parentSku”:"947994",”productPosition”:”16ealiu”,”criteoOnLoad”:”1”}]},”16ealium_cmx_event”:"criteo_on_pag”_”oad",”c”xTimeS”a”p”:”1738310347281”}}}],”query”:{“identity”:{“fetch”:[“ECID”]}}}

Figure 2

44. Additionally, while discovery is required to confirm the full extent of Private Information exchanged between Adobe and Criteo, upon information and belief, Adobe shares information it intercepts with Criteo, including but not limited to these keyword searches and unique identifiers, permitting Criteo to further enhance its own customer

profiles by synchronizing and cross referencing Criteo's data with information Adobe collects and stores in its ad ecosystem.

***ii. Viewing, clicking on, and purchasing medicine and merchandise***

45. After searching for products, including medicine, over the counter drugs, and other healthcare products, Website users may click on the products, place them in their shopping cart, and proceed to the checkout screen for purchase with those products in their cart. Figures 3 and 4 below, as redacted, show a user who has proceeded to the checkout screen with the following product in the user's shopping cart: Aspirin Regimen Bayer, 81mg Enteric Coated Tablets, Pain Reliever/Fever Reducer, 300 ct.[18]

[18] *See* https://www.cvs.com/shop/aspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-fever-reducer-300-ct-prodid-1012066


CVS Checkout
cvs.com/rx/dotm/checkout?flowType=FS
Please enter a valid first and last name.
Full Name
[redacted]
Street Address
[redacted]
Unit, apartment, etc (optional)
City
[redacted]
State
[redacted]
Zip code
[redacted]
Email address
[redacted]
Phone number
[redacted]
Order Summary
Subtotal (1 item) $19.49
Shipping $4.99
Tax $0.00
Total $24.48

Figure 3




Figure 4

46. Moreover, as shown in the redacted website traffic between the Website and Adobe's Adobedc.net server in Figure 5, below, which corresponds with the web image displayed in Figures 3 and 4, the Adobe Trackers, as created and facilitated by Adobe and implemented by CVS, capture and transmit user's browsing and transactional data, including searches. Highlighted in yellow, the Adobe Trackers transmit to Adobe both the URL of the checkout page, disclosing that the Website user is purchasing the product in his cart, and the URL of the product, together with the product ID, disclosing the exact identity of the purchased product.

47. Highlighted in blue, the Adobe Tracker also tracks the purchase event. The

"MetaConversion_Purchase" event is a type of event Adobe's Experience Cloud uses to record and track purchases or conversions made by a user on a website, and the "metaActionSource," "metaTimeStamp," and "metaCurrencyCode" track additional details of the conversion or purchase and disclose them to third-party Meta: in this instance, that the purchase was made via a website, the date and time, and that the purchase is being made on a website. Additionally, the "metaFBP" event stands for Facebook Pixel, which refers to the Facebook First-Party Cookie ID, used by Meta's Facebook Pixel to track user interactions on the website and link them to advertising campaigns on Meta's platforms. The value fb.1.173[redacted]0 consists of the Facebook Pixel prefix (fb.1), a timestamp ([redacted]), and a unique session identifier (8[redacted]0), which together allow Facebook to associate the user's session with advertising and tracking data.

48. Through Defendants' use of Adobe's event trackers (like MetaConversion_Purchase), Adobe collects Facebook-related data, such as the Facebook Pixel ID (metaFBP), which is a unique identifier tied to a user's browser session. This allows Adobe and Defendants to track user actions (e.g., purchases) and correlate them with Facebook ad interactions for attribution and retargeting purposes.

49. Regardless of the product Website users purchase, the Adobe Tracker is programmed to systematically intercept and disclose the same information. Additionally, highlighted in purple, the Adobe Tracker also assigns and tracks unique identifiers assigned to Website users and their activity on the Website, which are used, as described above, to individually identify the Website user.

50. The web images and traffic depicted in Figures 3, 4, and 5 reflect the activities of Website users proceeding as guests. However, the Adobe Trackers intercept the same substantive information reflected in these figures when a Website user is logged in, except that, when logged in, Adobe also intercepts additional persistent user identifiers, such as a PPID, which CVS transmits to allow Adobe to recognize logged in users and

associate the user's behavior across visits.

POST https://edge.adobedc.net/ee/or2/v1/interact?configId=367bc694-a0a5-4750-808c-a93acbac13bb&requestId=[redacted] HTTP/2 content-length: 1788 cache-control: max-age=0 sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 [redacted] sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132" content-type: text/plain; charset=UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/rx/dotm/checkout?flowType=FS accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: edge.adobedc.net {"meta":{"configOverrides":{},"sdkConfig":{"datastream":{"original":"2612b8ac-d4b2-4d6d-8d99-878e3f9e5846"}},"state":{"domain":"cvs.com","cookiesEnabled":true,"entries":[{"key":"kndctr[redacted]AdobeOrg_cluster","value":"or2"},{"key":"kndctr[redacted]AdobeOrg_identity","value":"[redacted]="}]}},"events":[{"xdm":{"web":{"webPageDetails":{"URL":"https://www.cvs.com/rx/dotm/checkout?flowType=FS"},"webReferrer":{"URL":"https://www.cvs.com/shop/aspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-fever-reducer-300-ct-prodid-1012066"}},"device":{"screenHeight":982,"screenWidth":1512,"screenOrientation":"landscape"},"environment":{"type":"browser","browserDetails":{"viewportWidth":1512,"viewportHeight":857}},"placeContext":{"localTimezoneOffset":-60,"localTime":"[redacted]"},"timestamp":"[redacted]","implementationDetails":{"name":"https://ns.adobe.com/experience/alloy","version":"2.19.2","environment":"browser"},"eventType":"MetaConversion Purchase","_cvs":{"Meta":{"metaActionSource":"website","metaFBP":"fb.1.[redacted]","metaTimeStamp":[redacted],"metaCurrencyCode":"USD"},"web":{"URL":"https://www.cvs.com/rx/dotm/checkout?flowType=FS","URLNoQps":"www.cvs.com/rx/dotm/checkout","name":"fs: common cart","oneTrustCategoryId":",C0001,C0011,C0012,C0013,","oneTrustOptanonConsent":"isGpcEnabled=0&datestamp=[redacted]+[redacted]+([redacted])&version=202411.1.0&browserGpcFlag=0&isIABGlobal=false&hosts=&landingPath=NotLandingPage&groups=C0001:1,C0011:1,C0012:1,C0013:1&AwaitingReconsent=false&geolocation=US;","profile":"fs"}}}}],"query":{"identity":{"fetch":["ECID"]}}}

Figure 5

51. Similarly, regardless of whether the Website user is logged in or proceeding as a guest, the Adobe Trackers also intercept the "productName"—in this case, Bayer Aspirin 81mg Low Dose Chewable Tablets Orange Flavored—and the "SkuID" and "parentSku"—in this case, 947994—to identify any products that a Website user clicks on that are responsive to searches to the user runs. As with purchases, Adobe also discloses to Meta when Website users click on these products, as evidenced by the

following web traffic:

MetaConversion_PageView","_cvs":{"Meta":{"metaActionSource":"website","metaEventID":"296065530702161б","metaFBP":"fb.1.1738310305172.[redacted]","metaTimeStamp":[redacted]},"web":{**"URL":"https://www.cvs.com/shop/aspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-fever-reducer-300-ct-prodid-1012066**","URLNoQps":"www.cvs.com/shop/aspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-fever-reducer-300-ct-prodid-1012066","name":"shop:pdp:Aspirin Regimen Bayer, 81mg Enteric Coated Tablets, Pain Reliever/Fever Reducer, 300 ct(695200)"

52. Likewise, and also regardless of whether the Website user is logged in or proceeding as a guest, the Adobe Trackers also intercept the identity of the product whenever a Website user places them in their cart, including by intercepting the reference URL of the product and the product SKU, as set forth in the following web traffic excerpt:

"decisionScopes":["__view__"],"surfaces":["web://www.cvs.com/rx/dotm/cart"]}},"xdm":{"web":{"webPageDetails":{"URL":"https://www.cvs.com/rx/dotm/cart?flowType=FS","pageViews":{"value":1},"name":"cvs|dweb|rx|dotm|cart|fs: common cart"},**"webReferrer":{"URL":"https://www.cvs.com/shop/aspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-fever-reducer-300-ct-prodid-1012066"}}**

[…]

","prop23":"www.cvs.com/rx/dotm/cart","prop46":"sl_v2=|slsdp="},"lists":{"list3":{"list":[{"value":"cs:Get_everything_you_need"}]}}},"event1to100":{"event45":{"value":1}},"event101to200":{"event107":{"value":0}},"event201to300":{"event269":{"value":24.48}},"event301to400":{}}},"productListItems":[{**"SKU":"695200"**,"_experience":{"analytics":{"customDimensions":{"eVars":{"eVar47":"fs","eVar71":"695200","eVar174":"false"}},"event101to200":{"event170":{"value":1}},"event201to300":{}}}}],"commerce":{"productListViews":{"value":1}}},"data":{"productstring":";695200;;;event170;eVar47=fs|eVar71=695200

[…]

***iii. Scheduling Vaccinations***

53. The Website also invites Website users to select vaccines and schedule appointments for their administration. As depicted below in Figures 6A, 6B, and 6C, as redacted, after selecting vaccines for administration and entering additional information, the Website requires users to confirm information they submitted, including their name, email address, phone number, the name of the vaccines, and the date, time, and location

of the appointment.




Figure 6A


Review Visit | CVS Pharmacy
cvs.com/scheduling/review?pharmacyLocation=true&lob=rximz&flow=vaccine&icid=cvs-home-s1-l2-vaccinations
Vaccine documents
Review documents
Date and location
When
Friday, January 31, 2025
at 08:45 AM PT
Change date or time
Where
6632 PACIFIC AVE.
STOCKTON, CA 95207
CVS pharmacy
Change location
Consent to contact you
I consent to receive SMS text messages. (required)
By confirming your visit, you are agreeing to:
Consent for Service and Contact
Confirm visit

Figure 6B




Figure 6C

54. As shown in the redacted website traffic in Figure 7, below, that corresponds with the web images displayed in Figure 6, the Adobe Trackers, as created by Adobe and implemented by CVS, intercept Website users' Private Information, including the name of the vaccine that the Website user confirmed an appointment to receive. Highlighted in yellow, the Adobe Trackers transmitted to Adobe the exact name of the vaccine—in this

case, “shingles”—and the location of the appointment, in this case, store ID “9830,” the street address of which is readily available online.[19] Regardless of the type of vaccine selected, the Adobe Tracker is programmed to systematically intercept the type of vaccine for which Website users reserved appointments to have administered. Additionally, highlighted in purple, the Adobe Tracker also assigns and tracks unique identifiers assigned to Website users and their activity on the Website, which are used, as described above, to individually identify them.

55. The web image and code depicted in Figures 6 and 7 reflect the activities of Website users that are proceeding as guests. However, the Adobe Trackers intercept the same substantive information reflected in these figures when a Website user is logged in, except that, when logged in, Adobe also intercepts additional persistent user identifiers, such as a PPID, which CVS transmits to allow Adobe to recognize logged in users and associate the user’s behavior across visits.

POST https://edge.adobedc.net/ee/or2/v1/interact?configId=314340a7-24fa-4366-890e-088383dc0cd9&requestId=[redacted]4 HTTP/2 content-length: 2741 cache-control: max-age=0 sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 [redacted]sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132" content-type: text/plain; charset=UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/scheduling/confirmation?pharmacyLocation=true&lob=rximz&flow=vaccine accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: edge.adobedc.net {"meta":{"configOverrides":{},"state":{"domain":"cvs.com","cookiesEnabled":true,"entries":[{"key":"kndctr [redacted] AdobeOrg cluster","value":"or2"},{"key":"kndctr [redacted] AdobeOrg identity","value":"CiY[redacted]="}]}},"events":[{"xdm":{"web":{"webPageDetails":{"URL":"https://www.cvs.com/scheduling/confirmation?pharmacyLocation=true&lob=rximz&flow=vaccine","pageViews":{"value":1},"siteSection":"usf","viewName":"cvs|dweb|scheduling|confirmation|usf:scheduling:confirmation"},"webReferrer":{"URL":"https://www.cvs.com/?icid=cvsheader:cvslogo"}},"device":{"screenHeight":982,"screenWidth":1512,"screenOrientation":"landscape"},"environment":{"type":"browser","browserDetails":{"viewportWidth":1512,"viewportHeight":857}},"pla

[19] CVS, https://www.cvs.com/store-locator/stockton-ca-pharmacies/6632-pacific-ave-stockton-ca-95207/storeid=9830 (last accessed July 9, 2025).

ceContext":{"localTimezoneOffset":-60,"localTime":"[redacted]"},"timestamp":"[redacted]","implementationDetails":{"name":"https://ns.adobe.com/experience/alloy","version":"2.19.2","environment":"browser"},"eventType":"web.webPageDetails.pageViews","_experience":{"analytics":{"customDimensions":{"eVars":{"eVar4":"cvs|dweb|scheduling|confirmation|usf:scheduling:confirmation","eVar49":"www.cvs.com/scheduling/confirmation","eVar41":"dweb","eVar26":"tweb","eVar38":"www.cvs.com","eVar35":"false","eVar3":"usf:digital","eVar57":"usf","eVar11":"rx","eVar12":"patient_number:1_of_1","eVar31":"rx registration status unknown","eVar32":"vax_upsell:denied","eVar51":"Review Visit | CVS Pharmacy","eVar52":"pharmacyLocation=true&lob=rximz&flow=vaccine","eVar55":"filter_not_applied","eVar78":"rx: immunizations: store_rx","eVar89":"9830","eVar106":"CA","eVar109":"list_view:1:locator_results","eVar111":"8-9","eVar138":"Shingles","eVar46":"p1:1_Shingles","eVar37":"p1:1_SHI","eVar159":"lob:rximz","eVar160":"rx_imz","eVar129":"self","eVar182":1,"eVar142":"tphrm=|mcvc2=on|ngs=|ga=g2|rbh2=off|mcpr=|hdau=|mcpe=bl|rxp=on|uh=|mvpe=gr|hp_uh=|canary=|ebe=|mca1=on","eVar143":"on","eVar25":"mfa_not found","eVar102":"login from imz flow:n","eVar152":"mobile_and_email","eVar9":"rx imz: individual","evar22":"22b97a85c60588115de847f9e9520965","eVar84":"covid_vax_preference:on"},"props":{"prop23":"www.cvs.com/scheduling/confirmation","prop11":"dweb","prop47":"1/31/2025 9:28 AM","prop75":"web view|mc profile","prop3":"usf:scheduling:confirmation","prop5":"usf","prop15":"same day","prop48":"prod","prop52":"pharmacyLocation=true&lob=rximz&flow=vaccine","prop43":"self","prop9":"rx: 9830"},"hierarchies":{"hier1":{"values":["cvs|dweb|scheduling|confirmation"]}}}}}},"data":{"__adobe":{"analytics":{"list2":"ld--dhs-ngs-legacy-confirmation"}}}}],"query":{"identity":{"fetch":["ECID"]}}}

Figure 7

56. Additionally, while discovery is required to confirm the full extent of Private Information exchanged between Adobe and Criteo, upon information and belief, Adobe shares information it intercepts with Criteo, including but not limited to this page view information and URLS, and unique identifiers, permitting Criteo to further enhance its own customer profiles by synchronizing and cross referencing Criteo's data with information Adobe collects and stores in its ad ecosystem.

***iv. Scheduling MinuteClinic Appointments***

57. The Website also invites Website users to communicate their symptoms or required medical procedures and confirm a virtual or in-person MinuteClinic appointment with a provider to receive medical treatment. CVS advertises its MinuteClinic as providing "high-quality health care[…] For everyone" and allowing Website users to

choose from 195 services offered by CVS' providers.[20] CVS promises that its "providers must be board certified and go through a continuous education process," and ensures that "you get the same great medical care at any of our locations across the country."[21] As depicted below in Figures 8A, 8B, and 8C, as redacted, after entering information describing Website users' symptoms or required procedure, the Website requires users to confirm the details of their submission, including their name, email address, phone number, symptoms for which they are seeking treatment or requested medical procedure, and the date, time, and location of the appointment.[22] CVS requires Website users to confirm information they submitted to confirm their appointments.

[20] https://www.cvs.com/minuteclinic
[21] *Id.*
[22] *See* https://www.cvs.com/minuteclinic


Review Visit | MinuteClinic
cvs.com/scheduling/review?pharmacyLocation=false&lob=mc&flow=core&rfvMappingId=22&rfvId=4&zipcode=95211&state=CA
I consent to receive text messages, automated calls or voicemails about this visit and follow-up visits, test results, health care, account and insurance for all phone numbers on file. Message and data rates apply. (optional)
By confirming your visit, you are agreeing to the Terms of Use and Privacy Policy. You also agree to share these visit details with your CVS.com account to inform app updates and notifications.
Confirm visit
Visit details
Edit patient details
What
Cold & Upper Respiratory Infection Evaluation
Date and location
When
Friday, January 31, 2025
at 09:45 AM PT
Change date or time
Where
Virtual visit
California
minute clinic
Confirm visit

Figure 8A


Confirmation | MinuteClinic
cvs.com/scheduling/confirmation;flowId=10?pharmacyLocation=false&lob=mc&flow=core
Good news!
[redacted] is all set
These visit details have been sent to your email.
Before your virtual visit
Complete health consents and add a payment method to save time at your visit.
Start PreCheck-In
Visit details
[redacted]
What
Cold & Upper Respiratory Infection Evaluation
Provider
MinuteClinic Provider
Confirmation code
9NX9V2G
Use this code to check in, reschedule or cancel your visit.
Reschedule or cancel your visit
What to bring

Figure 8B




Figure 8C

58. As shown in the redacted website traffic in Figure 9, below, that corresponds with the web images displayed in Figures 8A-8C, the Adobe Trackers, as implemented by CVS, intercept Website users' Private Information, including a description of the symptoms for which treatment is required or description of the requested medical procedures. Highlighted in yellow, the Adobe Trackers transmitted to Adobe this description as entered by the Website user—in this case, "Illness, Infection, or Injury" and "Cold & Upper Respiratory Infection Evaluation." Regardless of the type of symptoms

or requested procedures that Website users enter, the Adobe Tracker is programmed to systematically intercept the symptoms or requested procedures. Additionally, highlighted in purple, the Adobe Tracker also assigns and tracks unique identifiers assigned to Website users' activity on the Website, which are used, as described above, to individually identify the Website user.

59. The web images and traffic depicted in Figures 8 and 9 reflect the activities of Website users proceeding as guests. However, the Adobe Trackers intercept the same substantive information reflected in these figures when a Website user is logged in, except that, when logged in, Adobe also intercepts additional persistent user identifiers, such as a PPID, which CVS transmits to allow Adobe to recognize logged in users and associate the user's behavior across visits.

POST https://edge.adobedc.net/ee/or2/v1/interact?configId=314340a7-24fa-4366-890e-088383dc0cd9&requestId=[redacted] HTTP/2 content-length: 3046 cache-control: max-age=0 sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 [redacted] sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132" content-type: text/plain; charset=UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/scheduling/confirmation;flowId=10?pharmacyLocation=false&lob=mc&flow=core accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: edge.adobedc.net {"meta":{"configOverrides":{},"state":{"domain":"cvs.com","cookiesEnabled":true,"entries":[{"key":"kndctr [redacted] AdobeOrg cluster","value":"or2"},{"key":"kndctr [redacted] AdobeOrg identity","value":"CiY1MzcxMzY4[redacted]="}]}},"events":[{"xdm":{"web":{"webPageDetails":{"URL":"https://www.cvs.com/scheduling/confirmation;flowId=10?pharmacyLocation=false&lob=mc&flow=core","pageViews":{"value":1},"siteSection":"usf","viewName":"cvs|dweb|scheduling|confirmation;flowid=10|usf:scheduling:confirmation"},"webReferrer":{"URL":"https://www.cvs.com/minuteclinic?icid=cvs-home-s1-l3-health-visit-trgtperf"}},"device":{"screenHeight":982,"screenWidth":1512,"screenOrientation":"landscape"},"environment":{"type":"browser","browserDetails":{"viewportWidth":2016,"viewportHeight":1143}},"placeContext":{"localTimezoneOffset":-60,"localTime":"[redacted]"},"timestamp":"[redacted]","implementationDetails":{"name":"https://ns.adobe.com/experience/alloy","version":"2.19.2","environment":"browser"},"eventType":"web.webPageDetails.pageViews","_experience":{"analytics":{"customDimensions":{"eVars":{"eVar4":"cvs|dweb|scheduling|confirmation;flowid=10|usf:scheduling:confirmation","eVar49":"www.cvs.com/scheduling/confirmation;flowId=10","eVar41":"dweb","eVar26":"

dweb","eVar38":"www.cvs.com","eVar35":"false","eVar3":"usf:digital","eVar57":"usf","eVar11":"virtual","eVar12":"clinic_selected:no_badge","eVar31":"rx registration status unknown","eVar32":"vax_upsell:denied","eVar51":"Review Visit | MinuteClinic","eVar52":"pharmacyLocation=false&lob=mc&flow=core","eVar55":"filter_not_applied","eVar78":"mc:core:schedule","eVar89":"virtual","eVar106":"CA","eVar108":"visit_type:virtual","eVar109":"list_view:1:locator_results","eVar110":"usf:location:not_preselected","eVar86":"mfa:y|mrn_id:n|rx_connect_id:n","eVar111":"9-10","eVar138":"c1:Illness, Infection, or Injury","eVar37":"s1:Cold & Upper Respiratory Infection Evaluation","eVar159":"lob:mc","eVar160":"mc:other","eVar129":"self","eVar142":"tphrm=|mcvc2=on|ngs=on|ga=g2|rbh2=off|mcpr=|hdau=|mcpe=bl|rxp=on|uh=|mvpe=gr|hp_uh=|canary=|ebe=|mca1=on","eVar143":"on","eVar25":"mfa_not found","eVar102":"login from mc flow:n","eVar119":"pcp:disabled","eVar151":"ngs:mc_core","evar22":"22b97a85c60588115de847f9e9520965","eVar74":"virtual_visit:eligible","eVar157":"provider_type:generic"},"props":{"prop23":"www.cvs.com/scheduling/confirmation;flowId=10","prop11":"dweb","prop47":"1/31/2025 9:48 AM","prop13":"usf:duplicate:false","prop75":"web view|mc profile","prop3":"usf:scheduling:confirmation","prop5":"usf","prop15":"same day","prop48":"prod","prop52":"pharmacyLocation=false&lob=mc&flow=core","prop43":"self","prop14":"consent_to_contact:n","prop9":"virtual"},"hierarchies":{"hier1":{"values":["cvs|dweb|scheduling|confirmation;flowId=10"]}}}}}}},"data":{"__adobe":{"analytics":{"list2":"ld--dhs-ngs-legacy-confirmation"}}}}],"query":{"identity":{"fetch":["ECID"]}}}

Figure 9

### *v. Managing Prescription Drugs*

60. The Website also invites Website users with accounts to log in and manage and refill their prescription drugs.[23] As depicted below in Figure 10, as redacted, CVS requires Website users to confirm information they submitted to fill prescriptions, including their name, the name, phone number, and fax number of the prescriber, and details of the prescription to be filled, including the drug name: in this case—Amoxicillin 500 Mg Capsule.

[23] *See* https://www.cvs.com/pharmacy




Figure 10

61. As shown in the redacted website traffic in Figure 11, below, that corresponds with the web image displayed in Figure 10, the Adobe Trackers, as created by Adobe and implemented by CVS, intercept Website users' Private Information, including the name of the prescription drug that the Website user is filling. Highlighted in yellow, the Adobe Trackers transmitted to Adobe this description of the drug's name—"name": "Amoxicillin 500 Mg Capsule". Regardless of the type of prescription to be filled, the Adobe Tracker is programmed to systematically intercept the details of that prescription. Additionally, highlighted in purple, the Adobe Tracker also assigns and tracks unique identifiers assigned to Website users' activity on the Website, which are used, as described above, to individually identify the Website user.

POST https://edge.adobedc.net/ee/or2/v1/collect?configId=c370c17c-eda0-4cf9-bbd9-bcc730cd6d19&requestId=[redacted]6 HTTP/2 host: edge.adobedc.net content-length: 1848 sec-ch-ua-platform: "macOS" user-agent:

Mozilla/5.0 [redacted] sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132" content-type: text/plain; charset=utf-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: no-cors sec-fetch-dest: empty referer: https://www.cvs.com/ accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=4, i {"meta":{"configOverrides":{},"state":{"domain":"cvs.com","cookiesEnabled":true,"entries":[{"key":"kndctr_06660D1556E030D17F000101_AdobeOrg_cluster","value":"or2"},{"key":"kndctr_[redacted]_AdobeOrg_identity","value":"CiYxNTAyMj[redacted]"}]}},"events":[{"xdm":{"eventType":"web.webinteraction.linkClicks","web":{"webInteraction":{"name":"Amoxicillin 500 Mg Capsule","region":"rx-tile-0","type":"other","URL":"https://www.cvs.com/pharmacy/rx/drug-information?prescriptionId=[redacted]","linkClicks":{"value":1}},"webPageDetails":{"URL":"https://www.cvs.com/pharmacy/rx/prescriptions"},"webReferrer":{"URL":"https://www.cvs.com/?icid=cvsheader:cvslogo"}},"device":{"[redacted]"},"environment":{"type":"browser","browserDetails":{"viewportWidth":1890,"viewportHeight":1071}},"placeContext":{"localTimezoneOffset":-60,"localTime":"[redacted]"},"timestamp":"[redacted]","implementationDetails":{"name":"https://ns.adobe.com/experience/alloy","version":"2.19.2","environment":"browser"},"_experience":{"analytics":{"customDimensions":{"eVars":{"eVar35":"true"}}}}}}],"query":{"identity":{"fetch":["ECID"]}}}

Figure 11

62. At all relevant times, with respect to each of the above-described activities taken on the Website, CVS disclosed through the Adobe Trackers Website users' activities on the Website, and aided Adobe's collection, use, and disclosure of it to third parties unbeknownst to Plaintiff and Class Members. The unique identifiers identified above and in the corresponding web traffic that CVS sent to Adobe allowed Adobe to link the Private Information to specific Website users and identify them.

**E. Without Users' Knowledge or Consent, CVS Discloses and Aids in Criteo's Interception of Website Users' Private Information.**

63. In exchange for payment, Criteo offers data collection and advertising services to its customers including CVS. For instance, upon information and belief, as part of its customer relationship with CVS, Criteo offered snippets of code to CVS and other tracking services ("Criteo Trackers"), which were designed to track users' activity on the Website, unbeknownst to those users, together with unique identifiers capable of identifying them, for Criteo's and other third-parties' marketing uses. Upon information and belief, the various unique identifiers and information that Criteo intercepts employs allow it to identify Website users across different devices, visits, and touchpoints, creating a unique customer profile similar to Adobe's Identity Graph.

64. Companies like CVS can (and on information and belief, CVS does) utilize Criteo's advertising platform and services to target specific users. For example, Criteo offers "Lookalike Audiences" that permit its customers to target new customers whose browsing and purchasing behaviors resemble its existing users.

65. Upon information and belief, CVS contracted with Criteo for the implementation of the Criteo Trackers on its Website, after which CVS and Criteo implemented those tracking technologies onto the Website. As a result, CVS disclosed and Criteo intercepted Website users' private communications made to CVS on the Website. Plaintiffs and other Website users provided their PII, health information, and other sensitive data to CVS to obtain medical treatment and prescriptions and schedule vaccination and physician appointments without any knowledge these communications would be intercepted by a third-party for its own commercial benefit. In this way, Criteo directly intercepted, at a minimum, Website users' Private Information, including keyword searches and page views, including checkout pages.

66. Plaintiffs did not consent—or even know of— Criteo's interception and use of their communications with CVS. Criteo's interception of Plaintiffs' PII, health data,

and other highly sensitive information without their consent is an invasion of their privacy and violation of several laws, including CIPA and HIPAA.

67. Specifically, a live data-traffic analysis of CVS's Website showed that Criteo's tracking technologies installed on CVS' Website track these communications, regardless of whether these visitors were signed into the Website or using the Website as a guest. For example, if a Website visitor were to type specific queries into the search bar that appears at the top of CVS' Website, such as "pregnancy test," Criteo would intercept that information in the form of a URL request (as shown below) in yellow highlight. Further, among other identifying information, Criteo assigns numerous unique user identification values to each Website user, used to specifically identify each such visitor, as highlighted in part in blue below. Although not contained in the below traffic, the Criteo Trackers also obtain users' IP addresses.

GET
https://sslwidget.criteo.com/event?a=57162&v=5.37.0&otl=1&p0=e%3Dvl%26p%3D%255B743786%252C871694%252C298381%252C289586%252C177757%252C378503%252C555693%252C559408%252C430757%252C546712%252C340385%252C184046%252C549555%252C616827%252C398422%252C455366%252C921384%252C192485%252C630020%252C312813%255D%26kw%3Dpregnancy%2520test%26ca%3D%26pnb%3D1%26f%3D%255B%255D&p1=e%3Dexd%26rvi%3D&p2=e%3Ddis&bundle=TszKnV9yaVdTJTJCNVROZGlwUzZud2NWR3ZQb3R4VnhiSTJJY3p4ayUyQmZmbFJqQXBzR2lacUd2M29JMFhMMm91NkFRUndpR1hYZVZoVEtlajFsZTJ2YXZscUFsZ0dSc TdrRnJQTTNrNXlKaUFHUnVZZHEwZ1ZTcDY2ZGNmM05iJTJCZ2R3MUpqRVJZTzV1JTJGQnFRRXRlM0klMkZydVRMYXRWclI2eXlCekR3c1dmV0lieG14diUyQlNvVzZvOVZsbFh1VVZ5c0ttUnBjOXM&sc=%7B%22fbp%22%3A%22fb.1.[redacted]&tld=cvs.com&dy=1&fu=https%253A%252F%252Fwww.cvs.com%252Fsearch%253FsearchTerm%253Dpregnancy%252520test&pu=https%253A%252F%252Fwww.cvs.com%252Faccount%252Fcompliance%252Fdo-not-sell&ceid=9a668a3c-8768-40c2-a3e8-e9b2179ae847&consent_cookie=OptanonConsent HTTP/2 sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36 sec-ch-ua: "Google Chrome";v="135", "Not-A.Brand";v="8", "Chromium";v="135" sec-ch-ua-mobile: ?0 accept: / sec-fetch-site: cross-site sec-fetch-mode: no-cors sec-fetch-dest: script sec-fetch-storage-access: active referer: https://www.cvs.com/ accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 cookie:
uid=[redacted];
cto_bundle=E[redacted]s host: sslwidget.criteo.com

Figure 12

68. Similarly, when Website visitors visit a specific webpage, Criteo intercepts the title of the webpage, including checkout pages, revealing page information in the form of a URL request (as shown below). The website URL is highlighted in yellow below, together with coded information that the product has been added to the user's shopping cart, and one of the unique identifiers Criteo uses to uniquely identify users is highlighted in blue below. In this example, a Website user viewed Aspirin Regiment Baer 81mg Enteric Coasted Tablets for pain relief and added the product to their cart.

```
GET
https://sslwidget.criteo.com/event?a=%5B57162%5D&v=5.31.1&otl=1&p0=e%3Dvp
g&bundle=qJ3rxF9OQiUyRjR2U1JmQnc4YnU1QURKMnVnRUpMVXdCN0VHSX
BHNzZXVXByTWNEY0VxSUZ6SU05RjVrMTgxVW5iOWFNYWNMdzdSdlhZT
XRlUzBSeGJqS25nZWZZMHg1bDZIdGRtWnoxcyUyRkJ0a2Y4SG1PT0lKdGhwan
drUnVLYVl0VnJGcGVLZEZIdEs2b21adW4xSSUyRmFkVDlURnclM0QlM0Q&sc
=%7B%22fbp%22%3A%22fb.1.[redacted].[redacted]%22%7D&tld
=cvs.com&dy=1&fu=https%253A%252F%252Fwww.cvs.com%252Frx%252Fdotm
%252Fcart%253FflowType%253DFS&pu=https%253A%252F%252Fwww.cvs.com
%252Fshop%252Faspirin-regimen-bayer-81mg-enteric-coated-tablets-pain-reliever-
fever-reducer-300-ct-prodid-1012066&ceid=cfadb42f-b89c-4b0d-96bd-4eb362f840e1
HTTP/2
sec-ch-ua-platform: "macOS"
user-agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/132.0.0.0 Safari/537.36
sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132"
sec-ch-ua-mobile: ?0
accept: */*
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: script
referer: https://www.cvs.com/
accept-encoding: gzip, deflate, br, zstd
accept-language: en-US,en;q=0.9
cookie: uid=[redacted];
cto_bundle=SwEk1l[redacted]VOE8
host: sslwidget.criteo.com
```

Figure 13

69. The web images and traffic depicted in Figures 12 and 13 reflect the activities of Website users proceeding as guests. However, the Adobe Trackers intercept the same substantive information reflected in these figures when a Website user is logged

in, except that, when logged in, Adobe also intercepts additional persistent user identifiers, such as a PPID, which CVS transmits to allow Adobe to recognize logged in users and associate the user's behavior across visits.

**F. Without Users' Knowledge or Consent, CVS Discloses and Aids in Medallia's Interception of Website Users' Private Information.**

70. In exchange for payment, Medallia offers data collection and processing services to its customers including, on information and belief, CVS. As part of its customer relationship with CVS, Medallia offered snippets of code to CVS and other tracking services ("Medallia Trackers," collectively with Adobe Trackers and Criteo Trackers, "Tracking Technologies"), which were designed to track users' activity on the Website, unbeknownst to those users, together with unique identifiers capable of identifying them. Medallia's collection of Website users' private information was necessary to target CVS' specific users. Upon information and belief, the various unique identifiers and information that Medallia intercepts employs allow it to identify Website users across different devices, visits, and touchpoints, creating a unique customer profile similar to Adobe's Identity Graph.

71. Upon information and belief, CVS contracted with Medallia for the implementation of the Medallia Trackers on its Website, after which CVS and Medallia implemented those tracking technologies onto the Website. As a result, CVS disclosed and Medallia intercepted Website users' private communications made to CVS on the Website. Plaintiffs and other Website users provided their PII, health information, and other sensitive data to CVS to obtain medical treatment and prescriptions without any knowledge these communications would be intercepted by a third-party for its own commercial benefit. In this way, Medallia directly intercepted, at a minimum, Website users' Private Information, including keyword searches, prescription medicine, and page views, including checkout pages.

72. Plaintiffs did not consent to—or even know of—Medallia's interception and

use of their communications with CVS. Medallia's interception of Plaintiffs' PII, health data, and other highly sensitive information without their consent is an invasion of their privacy and violation of several laws, including CIPA and HIPAA.

73. Specifically, a live data-traffic analysis of CVS's Website showed that Medallia's tracking technologies installed on CVS' Website track these communications, regardless of whether these visitors were signed into the Website or using the Website as a guest. For example, if a Website visitor were to type specific queries into the search bar that appears at the top of CVS' Website, such as "pregnancy test," Medallia would intercept that information in the form of a URL request (as shown below) in yellow highlight. Further, among other identifying information, Medallia assigns numerous unique user identification values to each Website user, used to specifically identify each such visitor, as highlighted in part in blue below.

POST https://analytics-fe.digital-cloud.medallia.com/api/web/events HTTP/2 content-length: 1676 mec-integration-id: cvs-sc4-medallia-com-cvs sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36 sec-ch-ua: "Google Chrome";v="135", "Not-A.Brand";v="8", "Chromium";v="135" content-type: application/json charset: UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/ accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: analytics-fe.digital-cloud.medallia.com
[{"sessionScreenSize":"1512x982","sessionDua":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36","sessionPlatform":"MacIntel","referringUrl":"https://www.cvs.com/account/compliance/do-not-sell","pageTitle":"Shop Beauty, Vitamins, Medicine & Everyday Essentials | CVS.com","pageUrl":"https://www.cvs.com/search?searchTerm=pregnancy%20test", "type":"website","eventName":"nebula_after_http_get_request","timestamp":"[redacted]","eventTimezoneOffset":2,"accountId":[redacted],"propertyId":[redacted],"formId":null,"formTriggerType":null,"mdData":{"submittedDate":"","declinedDate":"1745925355656","lastInvitationView":"1745925351748","mdUserPercentile":"13.831256956179027","mdInvitePresented":"true","httpRequestData":{"requestUrl":"https://resources.digital-cloud.medallia.com/wdcus/183558/forms/12868/invitationData1706638460824_en.json","attemptNumber":0,"requestTotalTimeInSeconds":0.007}},"userId":"[redacted]","sessionId":"[redacted]","cookieSize":10561,"sdkVersion":"2.58.1","historyLength":4,"isUserIdentified":false,"clientHints":"{\"architecture\":\"arm\",\"bitness\":\"64\",\"brands\":[{\"brand\":\"Google Chrome","version":"135"},{"brand":"Not-

A.Brand","version":"8"},{"brand":"Chromium","version":"135"}],"fullVersionList":[{"brand":"Google Chrome","version":"135.0.7049.115"},{"brand":"Not-A.Brand","version":"8.0.0.0"},{"brand":"Chromium","version":"135.0.7049.115"}],"mobile":false,"model":"","platform":"macOS","platformVersion":"15.4.1","uaFullVersion":"135.0.7049.115","wow64":false}"}]

Figure 14

74. Similarly, when Website visitors visit a specific webpage, Medallia intercepts the title of the webpage, including checkout pages, revealing page information in the form of a URL request (as shown below). The website URL is highlighted in yellow below, and several of the identifiers Medallia uses to uniquely identify users are highlighted in blue below. In this example, a Website user viewed a three-pack of Clearblue Early Digital Pregnancy Tests.

POST https://analytics-fe.digital-cloud.medallia.com/api/web/events HTTP/2 content-length: 1798 mec-integration-id: cvs-sc4-medallia-com-cvs sec-ch-ua-platform: "macOS" user-agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36 sec-ch-ua: "Google Chrome";v="135", "Not-A.Brand";v="8", "Chromium";v="135" content-type: application/json charset: UTF-8 sec-ch-ua-mobile: ?0 accept: / origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/ accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: analytics-fe.digital-cloud.medallia.com [{"sessionScreenSize":"1512x982","sessionDua":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36","sessionPlatform":"MacIntel","referringUrl":"https://www.cvs.com/search?searchTerm=pregnancy%20test","pageTitle":"Clearblue Early Digital Pregnancy Test, Early Detection at Home Pregnancy Test, 3 CT (FSA Eligible) - CVS Pharmacy","pageUrl":"https://www.cvs.com/shop/clearblue-early-digital-pregnancy-test-early-detection-at-home-pregnancy-test-3-ct-prodid-743786","type":"website","eventName":"nebula_after_http_get_request","timestamp":"[redacted]","eventTimezoneOffset":2,"accountId":[redacted],"propertyId":[redacted],"formId":null,"formTriggerType":null,"mdData":{"submittedDate":"","declinedDate":"1745925355656","lastInvitationView":"1745925351748","mdUserPercentile":"13.831256956179027","mdInvitePresented":"true","httpRequestData":{"requestUrl":"https://resources.digital-cloud.medallia.com/wdcus/183558/forms/12868/invitationData1706638460824_en.json","attemptNumber":0,"requestTotalTimeInSeconds":0.032}},"userId":"[redacted]","sessionId":"[redacted]","cookieSize":11166,"sdkVersion":"2.58.1","historyLength":5,"isUserIdentified":false,"clientHints":"{\"architecture\":\"arm\",\"bitness\":\"64\",\"brands\":[{\"brand\":\"Google Chrome","version":"135"},{"brand":"Not-A.Brand","version":"8"},{"brand":"Chromium","version":"135"}],"fullVersionList":[{"brand":"Google Chrome","version":"135.0.7049.115"},{"brand":"Not-A.Brand","version":"8.0.0.0"},{"brand":"Chromium","version":"135.0.7049.115"}],"mobile":false,"model":"","platform":"macOS","platformVersion":"15.4.1","uaFullVer

sion":"135.0.7049.115","wow64":false}"}]

Figure 15

75. The web images and traffic depicted in Figures 14 and 15 reflect the activities of Website users proceeding as guests. However, the Medallia Trackers intercepts the same substantive information reflected in these figures when a Website user is logged out as they do when a user is logged in.

76. Additionally, as shown in Figure 16, below, when Website users log into the patient portal to manage their prescriptions, the Medallia Trackers, as created by Medallia and implemented by CVS and Medallia, intercept Website users' Private Information, including the name of the prescription drug that the Website user is filling. Highlighted in yellow, the Medallia Trackers transmitted to Medallia this description of the drug's name—"name": "Amoxicillin 500 Mg Capsule". Regardless of the type of prescription to be filled, the Medallia Tracker is programmed to systematically intercept the details of that prescription. Additionally, highlighted in blue, the Medallia Trackers also assigns and tracks unique identifiers assigned to Website users' activity on the Website, which are used to individually identify the Website user.

POST https://analytics-fe.digital-cloud.medallia.com/api/web/events HTTP/2 content-length: 2288 mec-integration-id: cvs-sc4-medallia-com-cvs sec-ch-ua-platform: "Windows" user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36 sec-ch-ua: "Google Chrome";v="135", "Not-A.Brand";v="8", "Chromium";v="135" content-type: application/json charset: UTF-8 sec-ch-ua-mobile: ?0 accept: */* origin: https://www.cvs.com sec-fetch-site: cross-site sec-fetch-mode: cors sec-fetch-dest: empty referer: https://www.cvs.com/ accept-encoding: gzip, deflate, br, zstd accept-language: en-US,en;q=0.9 priority: u=1, i host: analytics-fe.digital-cloud.medallia.com
[{"sessionScreenSize":"1600x900","sessionDua":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36","sessionPlatform":"Win32","referringUrl":"https://www.cvs.com/pharmacy/rx/prescriptions","pageTitle":"Amoxicillin 500 Mg Capsule CAP 500 Mg - Amoxil - Dosage, Side Effects & Drug Information - CVS Pharmacy","pageUrl":"https://www.cvs.com/pharmacy/rx/drug-information?prescriptionLookupKey=U2FsdGVkX186%2F8kj5pZT9PLxF%2FnZGZRom4lYHtDE%2F4SRvJbDhYJqoxKd0H8rMJcmeU9pDhX0ObM3hRRvc1qtlt%2BJuAzKzCVP9gI2fflbOE3eOXFSJnqd%2BJsRlHP7TGjB8PaZm9iupASJXXKLMzpOr0w2En3xZ%2FzMwpR1Fh0Fo9W0Uipczxl4IySifiorEG7mnKJnDF6YGa0mdxE9KwsxGlP64KPy9xPloDMVEQXt%2Bu3ZpIEAxGk9Wqo%2BJotj%2BcfNN%2F4NxTc

OXbdQxLk5JggAJZ1YdrrwrfbYwx4Sfg22N2B5pN2kgbwmDbh4qgnnZx0K%2BzF0
cLRwJRf%2F0ZBqAzH%2FQWy0gpErzclV91RAtuDZqY3vov3NmEWOhWbKn%
2BXbGXMOEVhrMI6%2Fz7Q3a6CYD0I2SCrWFRZDACFHtyEakgiwn7sfL9RbqB
o2Ib0KH7ZdFbCaNMxLtKJGfZAUd69ozC49WK%2FabiWK0oXQfLyiSdqJK35ja4
0X2mfJ6xE%2FyKrv68Dsuta8cyZlmq2gxKKbORI81g%3D%3D","type":"website","
eventName":"nebula_after_http_get_request","timestamp":"[redacted]","eventTimezoneOffset":-
7,"accountId":[redacted],"propertyId":[redacted],"formId":null,"formTriggerType":null,"m
dData":{"submittedDate":"","declinedDate":"1746030428256","lastInvitationView":"
1746030412502","mdUserPercentile":"98.86651731299457","mdInvitePresented":"",
"httpRequestData":{"requestUrl":"https://resources.digital-
cloud.medallia.com/wdcus/183558/forms/9664/formDataV2_1741173789635_en.json
","attemptNumber":0,"requestTotalTimeInSeconds":0.135}},"userId":"[redacted]","sessionId":"[redacted]","cookieSize":11395,"sdkVersion":"2.58.1","hist
oryLength":15,"isUserIdentified":false,"clientHints":"{\"architecture\":\"x86\",\"bitne
ss\":\"64\",\"brands\":[{\"brand\":\"Google Chrome","version":"135"},{"brand":"Not-
A.Brand","version":"8"},{"brand":"Chromium","version":"135"}],"fullVersionList":[
{"brand":"Google Chrome","version":"135.0.7049.115"},{"brand":"Not-
A.Brand","version":"8.0.0.0"},{"brand":"Chromium","version":"135.0.7049.115"}],"
mobile":false,"model":"","platform":"Windows","platformVersion":"19.0.0","uaFullV
ersion":"135.0.7049.115","wow64":false}"}]

Figure 16

**G. Plaintiffs and Class Members Had Multiple Bases for Reasonable Expectations of Privacy.**

77. Website users had a reasonable expectation of privacy in the Private Information they communicated with CVS, such as: search terms about health conditions for which they sought health care services and products; their managing of prescription drugs; their contacting of healthcare providers to make appointments for the administration of vaccines and MinuteClinic appointments; and details of the healthcare products, drugs, and vaccines, and symptoms/requested medical procedures about which Website users communicated with CVS on the Website.

78. Defendants' disclosure and interception of Plaintiffs' and Class Members' Private Information also violated HIPAA. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider," (2) "[r]elates to the past, present or future physical or mental

health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

79. HIPAA prohibits health care providers from "us[ing] or disclos[ing] 'protected health information' except as permitted or required by" the HIPAA Privacy Rule. 45 C.F.R. § 1644.502.

80. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI. The Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phone book because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[24]

81. The HHS has also issued the following guidance:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.[25]

82. The Office for Civil Rights ("OCR") at HHS previously issued a statement titled "Use of Online Tracking Technologies by HIPAA Covered Entities and Business

[24] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule; https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (accessed July 9, 2025).

[25] U.S. Department of Health and Human Services, Marketing; https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (accessed July 9, 2025).

Associates" discussing the use of the Meta Pixel by healthcare organizations:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[26]

83. HHS's view of PHI is broad:

> [Individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[27]

84. Commenting on a June 2022 report discussing the similar use of the Meta Pixel by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy advisor at HHS, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it . . . It is quite likely a HIPAA violation."[28]

85. As such, Plaintiffs and Class Members had every reason to believe the Private Information they communicated to CVS through the Website would be protected, rather than shared with Adobe, CVS, Medallia, and other third parties for marketing purposes.

---

[26] U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates; https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (accessed July 9, 2025).

[27] *Id.*

[28] Advisory Board, 'Deeply troubled': Security experts worry about Facebook trackers on hospital sites; https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (accessed July 9, 2025).

**F. Class Members' Private Information Had Financial Value, and Class Members Were Harmed.**

86. As stated in a 2017 feature story in *The Economist*, the "world's most valuable resource is no longer oil, but data."[29] Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

87. For example, in 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name." That same article noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge," and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[30]

88. A report from *Invisibly* found that PMI is one of the most valuable pieces of data within this data market.

> It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and PII, health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, healthcare

---

[29] The Economist, The world's most valuable resource is no longer oil, but data; https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (accessed July 9, 2025).

[30] TechCrunch, What's the Value of Your Data?; https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (accessed July 9, 2025).

breaches increased 55% in 2020.[31]

89. *Invisibly* also noted the following breakdown in average price for record type:

| Record Type | Average Price |
|---|---|
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

[32]

90. With regard to health care data specifically, CNBC reported in 2020 that hospital executives were receiving a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies.
>
> * * *
>
> De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patients records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting.[33]

91. Likewise, individuals can sell or monetize their own data if they so choose.

---

[31] Invisibly, How Much is Your Data Worth? The Complete Breakdown for 2021; https://web.archive.org/web/20250121040219/https://www.invisibly.com/learn-blog/how-much-is-data-worth/ (accessed July 9, 2025).

[32] *Id.*

[33] CNBC, Hospital execs say they are getting flooded with requests for your health data; https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (accessed July 9, 2025).

As an example, Facebook has previously offered to pay individuals for their voice recordings,[34] and has paid teenagers and adults up to $20 a month plus referral fees to install an application that allows Facebook to collect data on how individuals use their smartphones.[35] Numerous other companies and applications such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.[36]

92. CVS provides no such compensation to Plaintiffs and the Class in exchange for their surreptitiously obtained Private Information, but they should be held financially accountable to Plaintiffs and the Class under the laws sought to be enforced in this lawsuit.

**G. Plaintiff Getz's Experience**

93. On multiple occasions within the last year, from his home in Ventura, California, Plaintiff Getz visited CVS' Website and, through his interactions with the Website, provided his Private Information to CVS, including searching for and viewing sensitive health-related products on the Website.

94. Specifically, Plaintiff Getz has used the Website on numerous occasions within the past year to research over-the-counter medical products relating to a serious medical condition affecting Plaintiff. Plaintiff searched for the over-the-counter products on the Website and viewed the corresponding product pages after performing his searches for these medications.

95. As a result of Defendants' conduct, Plaintiff Getz received targeted advertisements as he browsed online webpages, both on the Website and on other websites, relating to his private activity on the Website. Specifically, after searching on

---

[34] The Verge, Facebook Will Now Pay You for Your Voice Recordings; https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognitionviewpoints-prounounciations-app (accessed July 9, 2025).

[35] CNBC, *Facebook Pays Teens to Install An App That Could Collect All Kinds of Data*; https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (accessed July 9, 2025).

[36] DOLLAR BREAK, 10 Best Data Collection Apps (Get Paid to Share Your Data)*: Earn a Passive Income*; https://www.dollarbreak.com/apps-that-pay-you-for-data-collection/ (July 9, 2025).

the Website for products related to his medical condition, Plaintiff saw advertisements on other websites for medications relating to that medical condition and related symptoms.

96. Plaintiff Getz used the Website for to search for and viewing sensitive health-related products on the Website, as described above, prior to June of 2024, as a "guest." He does not recall ever creating an account on the Website.

97. Plaintiff Getz was not aware of the tracking technology operating on the Website and did not consent to CVS' disclosure of his Private Information as described above.

98. Plaintiff Getz reasonably expected his communications with CVS via the Website to be confidential, and that such communications would not be transmitted to or intercepted by Adobe, Criteo, Medallia, or other third parties in a personally identifiable manner without disclosure to him and his corresponding express consent.

99. Pursuant to the systematic process described herein, CVS assisted Adobe with intercepting Plaintiff Getz's communications, including those that contained Private Information. CVS assisted Adobe's, Criteo's, and Medallia's interceptions without Plaintiff's knowledge, consent, or express written authorization.

100. By failing to receive the requisite consent, CVS breached its duty of confidentiality and aided the Third-Party Trackers in unlawfully intercepting Plaintiff Getz's Private Information.

101. Such acts are egregious violations of Plaintiff's right to and reasonable expectation of privacy.

**H. Plaintiff Brewer's Experience**

102. On multiple occasions within the last year, from his home in San Jacinto, California, Plaintiff visited CVS' Website and, through his interactions with the Website, provided his Private Information to CVS, including searching for and viewing sensitive health-related products on the Website.

103. Specifically, Plaintiff Brewer has used the Website on numerous occasions

within the past year to research over-the-counter medical products relating to a serious medical condition affecting Plaintiff and relating to private sexual health products. Plaintiff searched for these over-the-counter products on the Website and viewed the corresponding product pages after performing his searches for these medications. Plaintiff Brewer also purchased sexual health products after viewing them on the Website.

104. As a result of Defendants' conduct, Plaintiff Brewer received targeted advertisements as he browsed online webpages, both on the Website and on other websites, relating to his private activity on the Website. Specifically, after searching on the Website for products related to his medical condition, Plaintiff saw advertisements for medications relating to that medical condition and related symptoms. He also saw advertisements for similar sexual health products as those he purchased on the Website.

105. Whenever Plaintiff Brewer has used the Website, he has used it as a "guest." Mr. Brewer has not created an account on the Website.

106. Plaintiff Brewer was not aware of the tracking technology operating on the Website and did not consent to CVS' disclosure of his Private Information as described above.

107. Plaintiff Brewer reasonably expected his communications with CVS via the Website to be confidential, and that such communications would not be transmitted to or intercepted by Adobe, Criteo, Medallia, or other third parties in a personally identifiable manner without disclosure to him and his corresponding express consent.

108. Pursuant to the systematic process described herein, CVS assisted Adobe, Criteo, and Medallia with intercepting Plaintiff Brewer's communications, including those that contained Private Information. CVS assisted Adobe's interceptions without Plaintiff's knowledge, consent, or express written authorization.

109. By failing to receive the requisite consent, CVS breached its duty of confidentiality and aided the Third-Party Trackers in unlawfully intercepting Plaintiff's Private Information.

110. Such acts are egregious violations of Plaintiff's right to and reasonable expectation of privacy.

## TOLLING OF STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

111. All applicable statute(s) of limitations have been tolled by the delayed discovery doctrine. Plaintiffs and Class Members could not have reasonably discovered that Defendants disclosed their personal information linked to their identities through the Website until this action commenced.

112. Plaintiffs did not learn of Defendants' disclosure and interception of their personal information linked to their identities through the Website until being informed by the undersigned counsel of record shortly before this action was commenced.

113. Plaintiffs had no reason to believe their personal information was being intercepted by Adobe, Criteo, Medallia, or other third parties in the manner described above. Furthermore, the technologies CVS embedded on the Website are not visible to the user—they are invisible and work in the background.

114. As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

115. **Class Definition:** Pursuant to Section 382 of the Code of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as (collectively, "Classes"):

> **Nationwide Class:** All persons in the United States who accessed the Website and had their Private Information transmitted to third parties via the Adobe Trackers within the statute-of-limitations period through the date of class certification ("Class");
>
> **California Subclass:** All persons in the state of California who accessed the Website and had their Private Information transmitted to third parties via the Adobe Trackers within the statute-of-limitations period through the date of class certification ("California Subclass").

116. Plaintiffs reserve the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification, at class certification, or at any

later time as the Court permits.

117. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

118. Excluded from the Classes are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

119. Numerosity/Ascertainability. Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are in the tens of thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendants' records and non-parties' records.

120. Typicality. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs used the website and had their personal information disclosed to third parties without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

121. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

122. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the Class Members predominate over

questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. The following questions of law and fact are common to the Classes:

a. Whether Defendants' Website surreptitiously records personally identifiable information and subsequently, or simultaneously, discloses that information to third parties;

b. Whether Defendants shared Plaintiffs' and Class Members' Private Information resulting from their communications on the Website;

c. Whether Defendants secured prior consent before sharing Plaintiffs' and Class Members' communications on the Website;

d. Whether Defendants' conduct, which allowed Adobe, Criteo, and Medallia to view Plaintiffs' and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

e. Whether Defendants violated Plaintiffs' and Class Members' privacy rights by using the tracking technologies to communicate Website visitors' Private Information to Adobe, Criteo, and Medallia;

f. Whether Defendants are liable for actual or statutory damages under CIPA or any other relevant statutes, and the amount of such damages; and

g. Whether Defendants' actions violated the Unfair Competition Law;

h. Whether Defendants' actions violated Plaintiffs' and Class Members' privacy rights as provided by the California Constitution;

i. Whether Defendants breached a duty to safeguard Plaintiffs' and Class Members' sensitive personal and health information; and

j. Whether Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiffs and Class Members, all unlawful or inequitable proceeds that they received.

123. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Violation Of the California Invasion of Privacy Act (CIPA)**

**Cal. Penal Code § 631(a)**

124. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

125. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

126. California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … [ii] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or

> communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; [iii] or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

127. Therefore, under CIPA, a defendant must show it had the consent of all parties to a communication.

128. Plaintiffs' and Class Members' specific user input events and choices and information typed on CVS' website are tracked by Third-Party Trackers using the Tracking Technologies. The users' affirmative actions, such as inputting information, selecting options, and otherwise communicating with CVS through the Website constitute communications within the scope of CIPA.

129. At all relevant times, CVS aided, agreed with, and conspired with Third-Party Trackers to track and intercept Plaintiffs' and Class Members' Internet communications while accessing the Website. These communications were directly and indirectly intercepted by Third-Party Trackers, including Adobe, Criteo, and Medallia, in an individualized and personally identifiable manner without the authorization and consent of Plaintiffs and Class Members.

130. CVS and the Third-Party Trackers intentionally implemented the Tracking Technologies into CVS' Website that, without the knowledge and consent of Plaintiffs and Class Members, tracked and transmitted the substance of their confidential communications with Third-Party Trackers in an individualized and personally identifiable manner.

131. CVS willingly facilitated Third-Party Trackers' interception and collection of Plaintiffs' and Class Members' Private Information by embedding the Tracking Technologies on their Website.

132. Plaintiffs and Class Members are residents of California and used their

devices to access the Website within California. As such, Defendants record and disseminate Plaintiffs' and Class Members' data, communications, and personal information in California.

133. Plaintiffs and Class Members did not consent to Defendants' actions in implementing the tracking software as described above nor did they consent to Defendants' intentional collection, sharing, and interception of Plaintiffs' and Class Members' Private Information as described above.

134. At all relevant times to this Complaint, Plaintiffs and the other Class Members did not know Defendants were engaging in recording, sharing, and intercepting information as set forth above, and therefore could not provide consent to have any part of their private and confidential communications and personally identifiable information disclosed by CVS and thereafter transmitted to the Third-Party Trackers in a personally identifiable and individualized manner.

135. The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, the Tracking Technologies, as implemented on the Website, fall under the broad catch-all category of "any other manner":

a. The computer codes and programs the Third-Party Trackers used to track Plaintiffs' and Class Members' communications while they were navigating the Website;
b. Plaintiffs' and Class Members' browsers;
c. Plaintiffs' and Class Members' computing devices;
d. The Third-Party Trackers' web and ad servers;
e. The web and ad-servers from which the Third-Party Tracker, tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website; and
f. The computer codes and programs used by the Third-Party Trackers to

effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit the Website.

136. CVS failed to disclose that it is using software from the Third-Party Trackers, namely the Tracking Technologies, to track and automatically and simultaneously transmit communications and personally identifiable information in a de-anonymized and disaggregated fashion to the Third-Party Trackers for advertising purposes. Likewise, the Third-Party Trackers failed to disclose their use of the Tracking Technologies on the Website.

137. The Private Information CVS transmits and the Third-Party Trackers intercepts includes: 1) searching, viewing, and purchasing sensitive medicine, prescription drugs, and other healthcare products, including the name of those products; 2) searching for and booking appointments to receive vaccines, including the names of those vaccines; and 3) booking appointments with physicians for medical care, including the patient's symptoms or the medical procedures the patient requested.

138. The Tracking Technologies are designed so that they transmit each of the user's actions taken on the webpage to the Third-Party Trackers contemporaneously with the user making the communications. Thus, the communications were intercepted while they were in transit to the intended recipient, CVS, and before they reached CVS' server, or while they were being sent from any place within California.

139. As demonstrated hereinabove, CVS violate CIPA by aiding and permitting the Third-Party Trackers to receive its users' online communications through the Website without their informed consent. Criteo and Medallia likewise violate CIPA by directly and indirectly intercepting these communications through the Website without informed consent.

140. As a direct and proximate result of Defendants' violation of the CIPA, Plaintiffs and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

141. By disclosing and intercepting Plaintiffs' and Class Members' private information, Defendants violated Plaintiffs' and Class Members' statutorily protected right to privacy.

142. As a result of the above violations and pursuant to CIPA Section 637.2, Defendants are liable to each Plaintiff and Class Member for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiffs has suffered, or be threatened with, actual damages."

143. Under the statute, Defendants are also liable for reasonable attorney's fees, litigation costs, and injunctive and declaratory relief.

## **SECOND CAUSE OF ACTION**

### **Violation Of the California Invasion of Privacy Act (CIPA)**

### **Cal. Penal Code § 632(a)**

144. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

145. California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

146. Therefore, under CIPA, a defendant must show it had the consent of all parties to a communication.

147. Plaintiffs' and Class Members' specific user input events and choices and information typed on the Website are tracked by Defendants using the Tracking

Technologies. The user's affirmative actions, such as inputting information, selecting options, and otherwise communicating with CVS through the Website constitute communications within the scope of CIPA.

148. At all relevant times, Defendants used a recording device—the Tracking Technologies—to record Plaintiffs' and Class Members' Internet communications while accessing the Website. These communications were recorded and shared with, and intercepted by, the Third-Party Trackers in an individualized and personally identifiable manner without the authorization and consent of Plaintiffs and Class Members.

149. Defendants intentionally implemented the Tracking Technologies into the Website that, without the knowledge and consent of Plaintiffs and Class Members, recorded and transmitted the substance of their confidential communications with CVS to the Third-Party Trackers in an individualized and personally identifiable manner.

150. The Third-Party Trackers willingly coordinated and acted with CVS to install the Tracking Technologies on the Website.

151. Plaintiffs and Class Members are residents of California and used their devices to visit the Website within California. As such, Defendants record, disseminate, and intercept Plaintiffs' and Class Members' data, communications, and personal information in California.

152. Plaintiffs and Class Members did not consent to Defendants' actions in implementing the tracking software as described above nor did they consent to Defendants' intentional collection, sharing, and interception of Plaintiffs' and Class Members' Private Information as described above.

153. At all relevant times to this Complaint, Plaintiffs and the other Class Members did not know Defendants were engaging in the recording, sharing, and intercepting of information as set forth above, and therefore could not provide consent to have any part of their private and confidential communications and personally identifiable information disclosed by CVS and intercepted by the Third-Party Trackers in a personally

identifiable and individualized manner.

154. The following items constitute "recording device" under CIPA:

a. The computer codes and programs third parties, such as the Third-Party Trackers, used to track Plaintiffs' and Class Members' communications while they were navigating the Website; and

b. The computer codes and programs used by the Third-Party Trackers to effectuate their tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit the Website.

155. Defendants failed to disclose their use of the Tracking Technologies to track and automatically and simultaneously transmit communications and personally identifiable information in a de-anonymized and disaggregated fashion to the Third-Party Trackers for advertising purposes.

156. The Private Information the Tracking Technologies intercept includes: 1) searching, viewing, and purchasing sensitive medicine, prescription drugs, and other health products, including the name of those products; 2) searching for and booking appointments to receive vaccines, including the names of those vaccines; and 3) booking appointments with physicians for medical care, including the patient's symptoms or the medical procedures the patient requested. This information relating to Plaintiffs' and Class Member's health and receipt of medical care is inherently highly confidential.

157. As a direct and proximate result of Defendants' violation of the CIPA, Plaintiffs and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

158. By disclosing and intercepting Plaintiffs' and Class Members' private information, Defendants violated Plaintiffs' and Class Members' statutorily protected right to privacy.

159. As a result of the above violations and pursuant to CIPA Section 637.2, Defendants are liable to each Plaintiff and Class Member for the greater of treble actual

damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiffs has suffered, or be threatened with, actual damages."

160. Under the statute, Defendants are also liable for reasonable attorney's fees, litigation costs, and injunctive and declaratory relief.

## THIRD CAUSE OF ACTION

### Violation Of the Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

161. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

162. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

163. Defendants engaged in unlawful business practices in connection with their disclosure and interception of Plaintiffs' and Class Members' Private Information in violation of the UCL.

164. The acts, omissions, and conduct of Defendants as alleged therein constitute "business practices" within the meaning of the UCL.

165. Defendants violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiffs' and Class Members' constitutional rights to privacy, state privacy statutes, and state consumer protection statutes.

166. Defendants' acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including federal and state privacy statutes and state consumer protection statutes, such as CIPA) and constitute immoral, unethical, oppressive, and unscrupulous activities

that caused substantial injury, including to Plaintiffs and Class Members.

167. The harm caused by the Defendants' conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendants' legitimate business interests other than Defendants' conduct described therein.

168. As a result of Defendants' violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs' and Class Members' information is ongoing.

169. As result of Defendants' violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendants for services and/or other valuable consideration, e.g., access to their private and personal data. Plaintiffs and Class Members would not have used Defendants' services, or would have paid less for them, had they known the Defendants were breaching confidentiality by disclosing and intercepting their Private Information.

170. The unauthorized access to Plaintiffs' and Class Members' private and personal data also has diminished the value of that information.

171. In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendants' unlawful and unfair business practices. Therefore, Plaintiffs and members of the proposed Class are entitled to equitable relief to restore Plaintiffs and Class Members to the position they would have been in had Defendants not engaged in unfair competition, including an order enjoining Defendants' wrongful conduct, restitution, and disgorgement of all profits as a result of their unlawful and unfair practices.

## FOURTH CAUSE OF ACTION

### Breach of Confidence

172. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if

fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

173. Plaintiff and Class Members disclosed in confidence their health and private information with CVS through its Website. Plaintiffs and Class Members have an interest in keeping their protected private and medical information in confidence with CVS.

174. The information Defendants disclosed and intercepted in confidence is protected health and private information Defendants had knowledge was confidential due, in part, to federal and state laws that protect such information (i.e., CIPA, HIPAA).

175. Plaintiffs and Class Members had an expectation that the confidential information they provided to CVS and intercepted by the Third-Party Trackers would be kept in confidence with CVS due to the sensitive nature of their relationship with CVS and communications concerning sensitive health issues and medical care.

176. Defendants violated their duty to not intercept and to protect the confidentiality of Plaintiffs' and Class Members' information by using the Tracking Technologies to communicate and intercept patients' individually identifying information and confidential medical communications.

177. Defendants disclosed and intercepted Plaintiffs' and Class Members' confidential information for their own economic benefit and without Plaintiffs' and Class Members' knowledge or consent.

178. At no time did Defendants offer to purchase or financially compensate Plaintiffs and Class Members for the use of their confidential information for Defendants' advertisement purposes.

179. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to a breach of their confidence. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' breach of their confidence and are entitled to just compensation, including monetary damages.

180. Plaintiffs also seeks such other relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

181. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed California Subclass.

182. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet websites for the provision of health care without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

183. At all relevant times, by using the Tracking Technologies to disclose and intercept Website visitors' individually identifying information and their confidential medical communications, Defendants intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

184. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendants would not install wiretaps on the Website and secretly intercept their communications.

185. Plaintiffs and Class Members did not authorize Defendants to transmit or intercept Plaintiffs' and Class Members' private medical communications alongside their personally identifiable health information as described above.

186. This invasion of privacy is serious in nature, scope, and impact because it relates to Website visitors' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

187. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

188. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

189. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of Defendants' intrusions upon Plaintiffs' and Class Members' privacy.

190. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

191. Plaintiffs also seeks such other relief as the Court may deem just and proper.

## SIXTH CAUSE OF ACTION

### Common Law Invasion of Privacy—Intrusion Upon Seclusion

192. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Nationwide Class.

193. Plaintiffs and Class Members had a reasonable expectation of privacy in communications with CVS via the Website and the communications platforms and services therein.

194. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only CVS to receive and that they understood would be kept private.

195. Defendants' disclosure and interception of the substance and nature of those communications as described above without the knowledge and consent of Plaintiffs and

Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

196. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential and that Defendants would not secretly disclose and intercept their communications as described above.

197. CVS was authorized to obtain Private Information from Plaintiffs and Class Members for itself but was not authorized to force Plaintiffs' and Class Members' web browsers to transmit information to the Third-Party Trackers without their consent or authorization. Likewise, the Third-Party Trackers were not authorized to intercept Plaintiffs' and Class Members' private communications with CVS.

198. Defendants therefore obtained Plaintiffs' and Class Members' Private Information under false pretenses and/or exceeded their authority to obtain the Private Information.

199. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

200. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

201. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of Defendants' intrusions upon Plaintiffs' and Class Members' privacy.

202. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

203. Plaintiffs also seek such other relief as the Court may deem just and proper.

## SEVENTH CAUSE OF ACTION

### Negligence and Negligence Per Se

204. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

205. Plaintiffs and Class Members entrusted their sensitive and protected medical information and individually identifiable information to CVS.

206. Defendants had a duty to safeguard and not disclose or intercept Plaintiffs' and Class Members' sensitive and protected medical information and individually identifiable information as described above without Plaintiffs' knowledge or consent.

207. CVS also maintained a duty to safeguard and Plaintiffs' and Class Members' sensitive and protected medical information and identifiable information under their obligations to protect personally identifying health information as outlined by applicable laws and regulations, including but not limited to the statutory obligations for HIPAA and regulations from HHS.

208. The Third-Party Trackers likewise also maintained a duty to maintain the privacy of Plaintiffs' and Class Members' sensitive and protected medical information when working with CVS to intercept their communications.

209. Defendants could have configured the Adobe Trackers to not record, track, and transmit Plaintiffs' and Class Members' sensitive and protected medical information and individually identifiable information.

210. Defendants breached their duty to maintain the privacy of Plaintiffs' and Class Members' sensitive and protected medical information and individually identifiable information disclosed and intercepted communications containing this information without Plaintiffs' and Class Members' knowledge or consent, as described above.

211. As a result of Defendants' actions, Plaintiffs and Class Members have

suffered harm and injury, including but not limited to an invasion of their privacy rights.

212. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' negligence and are entitled to just compensation, including monetary damages.

**RELIEF REQUESTED**

213. Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court grant the following relief:

a. Determine that the claims alleged herein may be maintained as a class action and issue an order certifying the Class defined above;

b. Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

c. An order enjoining Defendants from engaging in the unlawful practices and illegal acts described herein;

d. An order awarding Plaintiffs and the Class: (1) actual, statutory, or nominal damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) equitable disgorgement and injunctive relief as pleaded or as the Court may deem proper; and (5) reasonable attorneys' fees, expenses, and costs of suit; and

e. Other such and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

214. Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury for all claims asserted in this Complaint so triable.

Dated: July 9, 2025

Respectfully submitted,

By: */s/ Jonathan M. Jagher*
Jonathan M. Jagher

Jonathan M. Jagher (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
923 Fayette St.
Conshohocken, PA 19428
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
jjagher@fklmlaw.com

Nicholas R. Lange (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4510
Facsimile: (224) 632-4521
nlange@fklmlaw.com

Jeff Ostrow (*pro hac vice*)
KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (925) 332-4200
Facsimile: (954) 525-4300
ostrow@kolawyers.com

John J. Nelson
Milberg Coleman Bryson Phillips Grossman PLLC
280 S. Beverly Dr.
Beverly Hills, CA 92102
(858) 209-6941
Jnelson@milberg.com

*Counsel for Plaintiffs and the Putative Classes*